STATE of Maine

v.

Joel SMITH.

Supreme Judicial Court of Maine.

Argued May 1, 1980.

Decided May 28, 1980.

Michael D. Seitzinger (orally), Charles K. Leadbetter, Fernand Larochelle, James G. Boulos, Jr., Asst. Attys. Gen., Augusta, for plaintiff.

Barnes & Sylvester, Forrest Barnes (orally), Severson & Hand, P. A., Daniel R. Nelson, Houlton, for defendant.

Before McKUSICK, C. J., and WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

McKUSICK, Chief Justice.

After a jury trial in Somerset County, to which a change of venue had been ordered at his request, defendant Joel Smith was convicted of murder, 17-A M.R.S.A. § 201(1)(A), (B) (Supp.1979). On appeal he contends that the presiding justice erred by his delay in severing defendant's trial from that of co-defendant Brenda Younk Smith,[1]

---

1. Brenda Younk Smith was later tried and convicted for the same crime. Her appeal from that conviction is denied by this court in a separate opinion issued simultaneously here-

by refusing to admit in evidence a taped confession by Brenda, and by finding defendant's own confession to be voluntary and therefore admissible. We affirm the judgment of conviction of murder.

The jury had before it the following evidence. In the spring of 1978 defendant had been arrested and jailed on a charge of selling marijuana to 17-year-old Gary Nadeau, who had told the police of the sale. While out of jail pending trial on the marijuana charge, defendant and his girlfriend, Brenda Younk, decided to prevent Nadeau from testifying against defendant. Defendant told a friend that he was going to "get rid of" Nadeau. On September 15, 1978, defendant devised and executed a plan by which two of his friends drove Nadeau to a pre-arranged spot where defendant and Brenda were waiting. They drove Nadeau to a deserted spot in the woods near Perham, beat him, placed him in a shallow grave, and then stabbed him with a sword. Nadeau died from three stab wounds in his chest and a skull fracture.

After defendant and Brenda returned home from the killing, both had mud on their clothes and defendant made several statements to various friends. One friend overheard defendant say, "I got him, I got him good. He'll never speak or talk again." Another heard defendant say that he had killed and disposed of Nadeau, that he had beaten Nadeau to death before burying him. A third friend heard defendant boast that he had taken care of Nadeau by beating, burying, and stabbing him with a sword owned by defendant. The following day, defendant and one of his accomplices were observed sanding the sword with sandpaper in order to remove bloodstains from the blade; defendant also expressed concern about stains on his clothes.

On October 7, 1978, defendant was in the Aroostook County jail, detained on a charge of operating a motor vehicle without a license. During a visit from his father, defendant asked to speak with Deputy Sheriff Cleary. After Cleary had given him the *Miranda* warnings, defendant began to describe to his father and the officer the events leading up to Nadeau's death. In defendant's story, Brenda did all of the beating, stabbing, and burying of Nadeau. After defendant finished his account he led Cleary and his father, along with the sheriff, to Nadeau's burial place.

Upon his return to the jail at 10:30 p. m., defendant was met by State Police Detective Porter. Porter had dinner brought to defendant, then asked him if he wanted to talk; defendant said yes, and did so until 2:00 a. m. At that point, defendant retold his account of the Nadeau killing for Porter to write down, and signed the statement upon completion. In brief, the signed confession stated that after defendant and Brenda picked up Nadeau at the drop-off point, defendant unsuccessfully attempted to bribe him to leave Maine and not testify at the upcoming trial on the marijuana charge. Defendant then decided to kill Nadeau and, upon dragging Nadeau out of the car, did so by a series of blows to the head; defendant used both his fists and a shovel to administer the beating. After Nadeau was placed in a shallow grave defendant, not Brenda, stabbed him with the sword. The death scene was chosen because defendant, who was familiar with the woodcutting operations in the area, knew there would be no cutting for three years on the side of the road where Nadeau was buried.

Defendant signed his confession at 4:27 a. m. on October 8. Later that same day, defendant asked to see Porter in order to correct "lies" he had made in his confession. During his second statement to Porter, defendant shifted the actual killing to Brenda. Three days later, when Porter told him he had been indicted for murder, defendant became angry and yelled, "I may be a murderer, but I'm not a damn thief." On October 12, while in the courthouse, defendant spontaneously said to another deputy sheriff that he had hit Nadeau on the head

with. *See State v. Smith*, Me., 415 A.2d 562 (1980). The co-defendants were married in

January, 1979, while held in the Aroostook County jail awaiting their trials for murder.

with a shovel and that both Brenda and he had covered the body with dirt before defendant ran the sword five or six times into Nadeau.

## I. *Severance*

More than a month prior to the June, 1979, trial the State filed a motion to join for a single trial the indictments pending against defendant and Brenda Younk Smith. At a hearing on the State's motion, defendant asserted that he would be prejudiced by joinder but made only vague generalizations as to the nature of the prejudice. The presiding justice concluded that defendant had not established any possibility of prejudice and ordered the indictments joined for trial.

On the first day of trial, defendant renewed his request that the cases be severed, citing potential problems involving defendant's statements inculpating Brenda and her statements both inculpating and exculpating defendant. The presiding justice again denied defendant's severance request. After the start of testimony in the joint trial, Brenda made a motion *in limine* that sought to excise from statements made by defendant any reference to her. In response, defendant's counsel renewed his motion to sever, adding that the testimony already heard by the jury had not yet raised the multitude of problems caused by subsequent witnesses who would testify about all the statements. The presiding justice, saying that he was now aware of the statements' role in the case, ordered the trial of Brenda severed from that of defendant, and, when the jury was brought back into the courtroom, gave careful limiting instructions explaining Brenda's sudden departure from the proceedings. Defendant neither requested a continuance nor moved for a mistrial.

On appeal defendant argues that the presiding justice's delay in severing his case from that of Brenda deprived him of a fair trial. Specifically, defendant cites the fact that all opening statements by counsel contemplated a joint trial; that both defendants were present during the testimony of the first two State witnesses; and that

upon the granting of the motion for severance, the sudden departure of Brenda and her attorneys was inadequately explained by the court. We have carefully reviewed the record and find that defendant has failed to establish actual prejudice.

 It is black letter law that a presiding justice's ruling on a severance or joinder motion will not be reversed on appeal absent an abuse of discretion. *State v. Millett*, Me., 392 A.2d 521, 528 (1978). The party moving for severance bears a significant burden:

> The appellant must make a clear showing of facts presented to the trial justice prior to trial which should have caused him to believe that the defenses of appellant and his codefendant were necessarily antagonistic or that he would be prejudiced by a joint trial.

*Id.* Vague generalizations of potential prejudice are insufficient to warrant severance. *See State v. Anderson*, Me., 409 A.2d 1290, 1298 (1979), holding that the mere mention of "antagonistic defenses" was not enough to alert the presiding justice to potential problems with co-defendants' statements.

 At the pretrial hearing held on the State's joinder motion, defendant made only vague and speculative assertions that joinder would result in prejudice, none of which could have alerted the presiding justice that the co-defendants would assert "necessarily antagonistic" defenses. On the morning trial began, defendant made a motion for severance and cited potential problems with statements made by Brenda and him; however, he failed again to provide the presiding justice with concrete facts showing that the statements would be used to develop antagonistic defenses. It was not until Brenda's motion *in limine*, made after the first two State witnesses had testified, that the conflicting statements were presented to the court. It was only then that sufficient facts were before the court to warrant its granting of severance. The presiding justice committed no abuse of discretion; rather, he properly exercised his "continuing duty to keep a watchful eye

over the proceedings and to order a severance if prejudice does appear." *Id.* at 1297 n. 5.

█ Not only has defendant failed to establish any abuse of discretion, but he has also failed to establish any prejudice caused by the granting of the severance motion after testimony had begun. At the time the motion was granted, only two witnesses had testified, both in regard to the location and condition of Nadeau's body; their testimony did not in any way open up any *Bruton*[2] problems involving the co-defendants' statements. The fact that defense counsel could not, in his opening statement, put the blame on Brenda did not prevent him from trying to do so in his closing argument, presumably then with much greater effect and impact upon the jurors and their deliberations. Although defendant's trial tactics may have been somewhat altered by the severance, he requested neither a continuance nor a mistrial, and otherwise than in his opening, he was uninhibited in asserting Brenda's guilt. His lack of success with the jury is in no way attributable to the delay in severance, especially in light of the presiding justice's clear limiting instructions to the jury, in which he cautioned that Brenda's departure did not mean she was innocent, but only that she was going to be tried separately.

## II. *The Voluntariness of Defendant's Confession*

Defendant contends that his first statement to Detective Porter, upon his return from disclosing the location of Nadeau's body, was not made voluntarily. However, before we can examine the merits of defendant's contention, we must first resolve the potential difficulty caused by the Superior Court's failure to make an explicit finding of voluntariness.

At the hearing held on his pretrial motion to suppress, defendant testified that when he told Porter he wanted to go to bed, Porter responded that it would be better to get everything out in the open right away.

Defendant thus "figured" he would not be allowed to go to bed that night and claims that his subsequent statement was influenced by lack of sleep. Porter testified that he did not suggest that defendant could not go to bed until he made a statement. In fact, Porter said that defendant gave him the impression that he wanted to talk, and at no time during the ensuing conversation did defendant attempt to leave or stop talking, nor did he say that he wanted to go to sleep.

After the hearing testimony was complete, defense counsel argued to the court that defendant's statement to Porter should be suppressed for two reasons: first, that it was the tainted fruit of defendant's allegedly "coerced" statement given to his father and the deputy sheriff before the body was discovered; and second, that it was made after extensive questioning and after defendant was denied the opportunity to sleep. The Superior Court justice, who later presided at trial, prefaced his oral ruling from the bench by stating that his decision necessarily involved the determination of whether defendant had knowingly and intelligently waived his right to have a lawyer present, and whether defendant's statements were induced by pressure, force, or fear. The justice found defendant's statement to his father and the deputy sheriff to have been given voluntarily, and thus defendant's statement to Porter could not be tainted; the court also found no *Miranda* violations in the statement to Porter. The court concluded that the statement was admissible and denied defendant's motion to suppress, but made no express finding that the statement to Porter had been made without coercion. During trial, in response to defendant's renewed involuntariness objection to admission of the statement into evidence, the court stated that it had "already passed on" the voluntariness issue. Neither at the motion hearing nor at trial did defendant mention the absence of an express finding of voluntariness.

---

2. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In Maine, confessions are governed by the "orthodox rule," under which the presiding justice, after an independent evidentiary hearing, solely and finally determines the evidentiary admissibility of a confession. *State v. Collins,* Me., 297 A.2d 620, 635–36 (1972). *See also* M.R.Evid. 104(a), 104(c). This procedure, which requires the primary determination of voluntariness by the judge, was specifically approved by *Jackson v. Denno,* 378 U.S. 368, 378–79, 84 S.Ct. 1774, 1781–82, 12 L.Ed.2d 908 (1964). The Court in *Jackson v. Denno* required that there be a "full and reliable" independent judicial determination of voluntariness. The trial "judge need not make formal findings of fact or write an opinion," but "his conclusion that the confession is voluntary must [nonetheless] appear from the record with unmistakable clarity." *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). The *Sims* rule was most recently applied by the Supreme Court in *Mincey v. Arizona,* 437 U.S. 385, 397 n. 12, 98 S.Ct. 2408, 2416, n. 12, 57 L.Ed.2d 290 (1978), where the unstated finding of voluntariness appeared from the record with "unmistakable clarity" because the parties, immediately prior to the trial court's ruling of admissibility, had directed their arguments to whether the challenged confessions had been made voluntarily.

The thrust of *Jackson v. Denno, Sims,* and *Mincey* is that where, as in Maine, by state procedure the trial judge is required to determine voluntariness for the purpose of admissibility of a confession, the simple denial of a motion to suppress will be adequate when the record clearly shows that the ruling was in fact based on a finding of voluntariness. *See Peterson v. State,* 372 So.2d 1017, 1019–21 (Fla.App. 1979), *aff'd* 382 So.2d 701 (Fla. 1980). In the case at bar, as in *Mincey,* the voluntariness issue before the Superior Court justice on the motion to suppress was clearly and explicitly stated by defense counsel immediately before the justice denied the motion from the bench. Additionally, the justice's comments regarding the *Miranda* and coercion questions posed by defendant's motion indicates that he was fully aware of his duty to make a separate and independent finding of the voluntariness of each of the seven statements sought to be suppressed. Under the circumstances, although it would have been better practice for the court to state that it found defendant's confession to Porter to be voluntary and to give its reasons for so concluding, the Superior Court justice's finding of voluntariness appears on the record with the unmistakable clarity required by *Sims v. Georgia.*

The determination of the presiding justice that a confession was voluntarily given will not be disturbed on appeal if "there is evidence providing rational support for the conclusion he reached." *State v. Catlin,* Me., 392 A.2d 27, 30 (1978), quoting *State v. Farley,* Me., 358 A.2d 516, 519 (1976). Turning to the merits of defendant's argument, we find the evidence here does provide rational support for the justice's ruling. According to defendant's own testimony, Detective Porter did not tell him that he *had* to stay awake and continue talking; rather, Porter merely suggested that it would be best for defendant to speak honestly, given defendant's previous stories and his obvious involvement in Nadeau's murder. Porter used no promises of leniency, no threats, and no harsh or deceptive interrogation techniques. Defendant was not surrounded by a team of interrogators and was well aware of his *Miranda* rights. He dictated a written confession and then read and signed it. Additionally, when he summoned Porter to his cell some fifteen hours after signing his confession, he did so not to complain about a coerced confession but to correct certain "lies" he had told. In sum, there is ample evidence to support the conclusion that defendant's confession was voluntarily given.

### III. Exclusion of Brenda Younk Smith's Confession

At trial, defense counsel attempted to place in evidence a cassette tape confession made by Brenda. The presiding justice, out of the presence of the jury, conducted a voir dire examination to determine its admissi-

bility. A matron at the jail testified that defendant and Brenda normally communicated by exchanging several tapes a day. Upon the denial in April, 1979, of defendant's motions to suppress various confessions and admissions of his own, Brenda became extremely depressed. Three days later Brenda made the taped confession offered at trial; the matron delivered the tape to defendant, who cried *before* listening to the tape, thus leading the matron to believe he already knew what was on the tape. The matron said that defendant could "almost control Brenda," that she would do nearly anything he asked of her. A friend of Brenda's testified that over a period of months she had given several inconsistent versions of the killing, and that on one occasion Brenda stated that defendant had asked her to confess and take all the blame.

The presiding justice excluded Brenda's cassette confession and its transcript from evidence, ruling that defendant's corroborative evidence did not "clearly indicate the trustworthiness of the statement" as required by M.R.Evid. 804(b)(3). On appeal defendant makes two contentions: that the proffered exculpatory statement by Brenda was sufficiently corroborated by independent evidence, and that the statement's exclusion amounts to a denial of defendant's constitutional right to due process. Both contentions are without merit.

Prior to our adoption of Evidence Rule 804(b)(3) in 1976, statements against pecuniary or proprietary interest were admissible as an exception to the hearsay rule, while statements against penal interest were not so admissible. *See State v. Gervais*, Me., 317 A.2d 796, 802–03 (1974); R. Field & P. Murray, *Maine Evidence* § 804.4, at 239 (1976). Rule 804(b)(3) extends the hearsay exception to include declarations against the penal interest of the declarant, *but* imposes upon an accused offering a statement tending to exculpate him the additional burden of making a clear showing of its trustworthiness:

**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . . .

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a co-defendant or other person implicating both himself and the accused, is not within this exception.

The rule thus sets forth three requirements for an accused who offers an out-of-court statement exculpatory of himself: (1) the declarant must be unavailable as a witness; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in her position would not have made the statement unless she believed it to be true; and (3) the statement must be corroborated by circumstances that "clearly" indicate its trustworthiness.

 Here the first requirement was readily met. Evidence Rule 804(a)(1) provides that a declarant is unavailable as a witness in a situation where she is exempted by a court ruling on the ground of privilege from testifying on the subject matter of her statement. In the case at bar, at the time defendant's trial was severed from that of Brenda, she stated that she would invoke her Fifth Amendment privilege against self-incrimination if called to testify at defendant's trial.

Although the State has not put the second requirement in issue here, our examination of the offered testimony suggests that it might not inculpate the declarant

Brenda to the extent "that a reasonable [person] in [her] position would not have made the statement unless [s]he believed it to be true." *Cf. United States v. Hoyos,* 573 F.2d 1111, 1115 (9th Cir. 1978). In any event we need not decide whether Brenda's statement meets that "against penal interest" requirement, because the third requirement of clear corroboration of trustworthiness is not satisfied.

Federal Evidence Rule 804(b)(3), in the form it was originally promulgated by the United States Supreme Court, required statements against penal interest that exculpated the accused to be merely "corroborated." The House of Representatives modified the proposal by adding the language "unless corroborating circumstances clearly indicate the trustworthiness of the statement"; its reason was that "statements of this type tending to exculpate the accused are more suspect and so should have their admissibility conditioned upon some further provision insuring trustworthiness." House Comm. on the Judiciary, Proposed Federal Rules of Evidence, H.R. Doc. 650, 93d Cong., 1st Sess. 15–16 (1973). The House modification was accepted by the Senate and incorporated into the rule. Although the Advisory Committee's Note to Rule 804 does not set forth what specific circumstances may satisfy the corroboration requirement, it does state that the "requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication." *See generally* 4 Weinstein's Evidence, pp. 804–10 to 24 (1979). Courts have accordingly construed the requirement to be a significant one, going beyond minimal corroboration. *See United States v. Hoyos, supra ; United States v. Barrett,* 539 F.2d 244, 253 (1st Cir. 1976); *Laumer v. United States,* 409 A.2d 190, 200 (D.C. 1979).

 Factors relevant to gauging trustworthiness in this context include (1) the time of the declaration and the party to whom it was made; (2) the existence of corroborating evidence in the case; (3) whether the declaration is inherently inconsistent with the accused's guilt; and (4) whether at the time of the incriminating statement the declarant had any probable motive to falsify. *See Chambers v. Mississippi,* 410 U.S. 284, 300–01, 93 S.Ct. 1038, 1048, 35 L.Ed.2d 297 (1973); *United States v. Hoyos, supra ; State v. Haywood,* 295 N.C. 709, 730, 249 S.E.2d 429, 442 (1978); *State v. Young,* 89 Wash.2d 613, 626–27, 574 P.2d 1171, 1180 (1978). The focus on time derives from the belief that declarations made soon after the crime for which the accused is charged are more reliable than those made after a lapse of time that offers the declarant an opportunity for reflection and contrivance. *Compare Chambers v. Mississippi, supra* 410 U.S. at 300, 93 S.Ct. at 1048 (declaration made shortly after crime is a strong indication of reliability), *with United States v. Guillette,* 547 F.2d 743, 754 (2d Cir. 1976), *cert. denied,* 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977) (declaration made four months after crime too attenuated and remote to assure reliability). In this case, Brenda made her confession some seven months after the Nadeau murder and six months after both she and defendant had been indicted for it. In jail in the meantime, she had had ample opportunity for reflection and fabrication.

It has also been said that the existence of a close relationship between the declarant and her listener *may* provide an indication of trustworthiness because the declarant would have no motive to falsify. *See Chambers v. Mississippi, supra* 410 U.S. at 300, 93 S.Ct. at 1048; *Laumer v. United States, supra* at 201. However, here, the close relationship between Brenda and defendant provided a motive for Brenda to attempt falsely to exculpate defendant, whom she had some months before married in jail. The declaration was made very soon after defendant lost his motion to suppress his own confession, which fact increased the likelihood of his conviction. There was independent evidence that defendant had at some point in time asked Brenda to take all the blame, that defendant exerted a great deal of control over Brenda, and that after her declaration but before trial Brenda had told a friend that both she *and* defendant had beaten Nadeau

to death. It is also significant that defendant began to cry upon his receipt of the cassette tape but *before* he had listened to it, thus suggesting that he was already aware that Brenda was going to try to save him from trial and conviction.

■ Brenda's statement inculpating herself was not necessarily inconsistent with defendant's guilt of actively planning and participating in the events leading to Nadeau's death. Where the declaration is offered to exculpate an accused, the circumstances indicating trustworthiness must clearly corroborate the *exculpatory*, as well as the inculpatory, nature of the statement. The first sentence of Rule 804(b)(3) assures that at the threshold the offered statement is sufficiently inculpatory of the declarant to be reliable; the second sentence sets the standard of clear corroboration necessary to assure the reliability of the declaration's exculpation of the accused, the ultimate issue on which the evidence is offered.

Here all the evidence independent of Brenda's taped confession tended to prove Joel Smith's involvement in the crime, rather than to corroborate her attempts to exculpate him. Brenda's statement suggested that defendant, although present near the murder scene, had not participated in or witnessed the beating, stabbing, or burying of Nadeau. The record contains no evidence that corroborates, clearly or otherwise, Brenda's attempt to clear defendant. On the contrary, the evidence showed that when defendant returned home that evening he (1) had mud on his clothes; (2) said "I got him, I got him good. He'll never speak or talk again"; and (3) boasted that he had taken care of Nadeau by beating, burying, and stabbing him. The next day defendant was concerned with blood on *his* clothing and *his* sword. Furthermore, un-

like Brenda's rather vague statement, defendant's confession to Detective Porter contained exhaustive detail of the various blows and injuries inflicted upon Nadeau, injuries corroborated by the medical testimony. Finally, defendant made a spontaneous statement after his indictment, that it was he who had beaten Nadeau with a shovel before stabbing him with the sword.

In view of all the evidence, it cannot be said that the trustworthiness of the exculpatory features of Brenda's out-of-court declaration was clearly indicated by corroborating circumstances. The presiding justice was entirely correct in excluding the proffered cassette confession because it failed to meet the "trustworthiness" requirement of Rule 804(b)(3).

Furthermore, the decision to exclude untrustworthy hearsay in no way violated defendant's constitutional right to present witnesses in his own defense. *See Chambers v. Mississippi, supra* 410 U.S. at 302, 93 S.Ct. at 1049. The right of an accused to present witnesses in his own behalf, even though "[f]ew rights are more fundamental," does not grant him complete freedom to introduce evidence that fails to "comply with established rules of . . . evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id. See United States v. Fosher,* 590 F.2d 381, 384 n. 2 (1st Cir. 1979).

■ Our review of the entire record of the trial resulting in Joel Smith's conviction for murder reveals no reversible error.[3] The entry must be:

Appeal denied.

Judgment affirmed.

All concurring.

---

**3.** Defendant's request that the closing argument be transcribed was denied by the presiding justice, despite the mandate of 4 M.R.S.A. § 651 (1979) that court reporters "shall take full note of . . . *at the request of any party, all statements and arguments of counsel addressed to the jury . . . .*" (Emphasis added) The emphasized language was added in 1977, subsequent to our decision in *State v. Taylor,* Me., 343 A.2d 11, 21 (1975), when sec-

tion 651 was repealed and replaced by P.L. 1977, ch. 208, § 1. Although it was error to deny the requested recording of the closing arguments, defendant has not argued on appeal that he suffered any prejudice therefrom, nor do we find that any prejudice did occur. However, the statute should be observed and the simple device of instructing the court reporter not to interrupt closing argument can protect against potential problems.