UNITED STATES of America, Appellee,

v.

Harley Joe SEABOLT, Appellant.

No. 91–2837MN.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 13, 1992.

Decided March 3, 1992.

James E. Ostgard, Minneapolis, Minn., argued, for appellant.

Joan Ericksen Lancaster, Asst. U.S. Atty., Minneapolis, Minn., argued, for appellee.

Before ARNOLD, Chief Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

PER CURIAM.

Harley Joe Seabolt appeals his conviction and sentence after being found guilty of robbing a bank while armed. We affirm.

A lone gunman robbed the Drovers First American Bank in Inver Grove Heights, Minnesota, on December 21, 1990. At the time of the robbery, three tellers and the bank manager were the only persons in the bank. The robber escaped with $13,301 in cash which was thrown into the robber's garment bag by the victim teller. The $13,301 in cash included $500 in bait money.

FBI agents arrived a little more than one hour after the robbery. All three bank tellers told the FBI who had robbed them: Harley Joe Seabolt, a former bank customer. Although Seabolt had worn a nylon stocking over his face, all three tellers had had face-to-face dealings with him as a bank customer and positively identified him to the FBI.

Less than twelve hours after the robbery, FBI agents executed a search warrant at Seabolt's home. The agents found a blue suitcase containing $12,316 in cash. This money included the $500 in bait money

taken from the bank. A stack of $100 bills carried a $2000 band identifying the victim teller by her teller number and carrying the date of the robbery. The victim teller positively identified the money taken from her during the robbery. Other bills were wrapped by bands used by the bank on the date of the robbery. The garment bag used in the robbery was also found in Seabolt's home. Seabolt, who was clean shaven during the robbery, had already begun to grow the beard he sported at his trial.

Seabolt testified at his trial. The district court [1] found Seabolt "utterly without credibility." The district court found further that defendant had concocted a "bizarre tale and deliberately attempted to obstruct the reasonable processes of this court." Finally, the district court concluded that "no reasonable trier of fact (would believe) and frankly no reasonable defendant would have attempted to foist such a tale."

Seabolt said the blue suitcase contained $11,801 at the time the search warrant was executed. Of this, "probably $7,000 maybe $7,500" had come from door-to-door sales of fruit, and the rest had come from a check kiting scheme. He claimed the $500 in bait money was not in the suitcase at the time the search warrant was executed, but intimated that it was planted by FBI agents.[2] The bank bands, he explained, were used because he had been saving his money in a paper bag until it got "too big for the bag." He formerly used rubber bands to wrap the money, but he encountered a "problem" because he would sometimes "get too many of the same denomination of bills in the rubber bands and they'd—the bills would start to tear around where the rubberbands would hold them." That is why, he explained, he went to Inver Grove Heights Bank to ask them for bank wrappers. By June of 1990, Seabolt testified, he had to transfer his growing cache of cash to the blue suitcase because the

brown paper bag was beginning to get too small to hold all his bundles of money. Seabolt also testified that he engaged in the check kiting scheme with the intention of giving the money back, and not because he was short of money. Seabolt's father-in-law testified that "around Thanksgiving time" he had seen Seabolt put a large amount of cash into the blue suitcase.

Seabolt also made a proffer of the testimony of a fellow inmate by the name of James Morris. Morris would have testified, according to Seabolt's proffer, that he was transported from the Stillwater Prison to a detention facility on March 12, 1991, with Seabolt. Morris would have testified that a man named "Dewey" or "Dooley" was also at this detention facility and told Morris and Seabolt over a game of Monopoly that he knew who pulled off the Inver Grove Heights heist, and that it was a guy "in Kentucky, or from Kentucky who not long ago had told Dewey what he had done, committed that robbery." Morris would have testified that Dewey had told him that he gave the Kentucky man a gun, but was unclear in his recollection of whether the gun he supplied was used in the Inver Grove Heights robbery.

It is unclear who "Dewey" is, but it is likely that it could be Duane Bigger. Bigger said he would invoke his rights under the Fifth Amendment if he was called to testify at trial and he apparently never submitted to an interview by defense counsel. No true identity of the original declarant (hereinafter Mr. Kentucky) was ever made and no details were offered as to the time and circumstances of the alleged statement. The trial court excluded the hearsay statement.

Seabolt was convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a) (1988). The trial court gave Seabolt a two-point enhancement of his Guidelines sen-

---

1. The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

2. No credible evidence of such a scheme was introduced. In order for such a frame-up to have occurred, one of two scenarios would need to be shown: (1) all four bank employees con-

spired with the FBI to frame Seabolt by lying about placing the bait money in the duffle bag, or (2) the FBI captured the real robber, retrieved the bait money, and released the real robber, all during those 12 hours prior to the execution of the search warrant at Seabolt's home.

tence for obstruction of justice because he found that Seabolt had perjured himself at the trial and had suborned the perjury of his father-in-law. Seabolt was thus given a Guidelines range of 108 to 135 months and was sentenced to 135 months. He appeals the conviction and the sentence.

## I.

Seabolt challenges the district court's exclusion of the hearsay statement of Morris. Seabolt offered the hearsay statement under Fed.R.Evid. 804(b)(3), which provides that statements made against the criminal interest of the declarant are not excluded by the hearsay rule. When the declarant's statement is said to expose the declarant to criminal liability, while exonerating the accused, it is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. *Id.*

To admit hearsay statements under Rule 804(b)(3), three elements must be met: (1) the declarant must be unavailable to testify at trial, (2) the statement must tend to subject the declarant to criminal liability to such an extent that no reasonable person in his position would have made the statement unless he believed it to be true, and (3) the statement must be supported by corroborating circumstances clearly indicating the trustworthiness of the statement. *United States v. Tovar*, 687 F.2d 1210, 1213 (8th Cir.1982). We find that none of the elements of Rule 804(b)(3) have been met. First, it is unclear that Mr. Kentucky—whoever he is—was unavailable to testify. Second, a statement by one criminal to another criminal (translated by the second criminal to a third criminal) about a heist the first criminal allegedly pulled off is more apt to be jailhouse braggadocio than a statement against his criminal interest. Finally, there are no corroborating circumstances that clearly indicate the trustworthiness of the statement. It borders on the impossible for the district court to analyze the trustworthiness of a state-

ment made by an unknown person (Mr. Kentucky) to a vaguely identified person (Dewey or Dooley) and restated over a game of monopoly[3] in the cellblock. Moreover, even if we were to conclude that Mr. Kentucky's statement to Dewey was against interest and reliable, Seabolt's claim fails because the second link in this double hearsay falls outside of Rule 804(b)(3). Since Dewey was unclear about whether he gave a gun to Mr. Kentucky, or whether the gun was used in the robbery, his ambivalent statement could not be construed to be against his interest. We find the district court's refusal to admit the hearsay statement was not an abuse of discretion. *See United States v. Young*, 804 F.2d 116, 119 (8th Cir.1986), *cert. denied*, 482 U.S. 913, 107 S.Ct. 3184, 96 L.Ed.2d 673 (1987).

Seabolt also challenges the two-point enhancement for obstruction of justice under § 3C1.1 of the Sentencing Guidelines. The district court granted the enhancement after specifically finding that Seabolt perjured himself and suborned the perjury of his father-in-law. The district court did not base its decision merely on the fact that the jury disbelieved the testimony in finding Seabolt guilty. Rather, this experienced trial judge based his decision on his personal observation of Seabolt and his father-in-law. "Having presided over the defendant's trial, the Court is intimately familiar with the defendant's and his father-in-law's testimony. The Court observed the witnesses' demeanor, heard their testimony, and finds it to be inherently incredible. No reasonable trier of fact could find his testimony true." *United States v. Seabolt*, No. 3–91–8, sentencing memorandum and statement of reasons at 3 (D.Minn. Aug. 2, 1991). The district judge made a clear-cut finding of perjury based on the witnesses' demeanor and all the evidence presented at the trial. We applaud the clarity of his findings. Moreover, these findings are consistent with our precedents. Obstruction of justice includes

---

**3.** In its brief, the government reminds this court that Monopoly is a board game in which players

can get out of jail free.

committing, suborning or attempting to suborn perjury. § 3C1.1 application note 3(b); *United States v. Ogbeifun,* 949 F.2d 1013, 1013–14 (8th Cir.1991). Since we find the district judge made a thorough review of the evidence and made an explicit finding of perjury, this ruling was not clearly erroneous. *See id.*

## II.

For the foregoing reasons, the judgment of the district court is affirmed.