STATE of Maine

v.

Michael M. BOUCHER, Sr.

Supreme Judicial Court of Maine.

Argued Oct. 5, 1994.
Decided Dec. 23, 1994.

Linda J. Conti (orally), Asst. Atty. Gen., Augusta, for State.

S. Campbell Badger (orally), Drummond, Woodsum, Plimpton & MacMahon, Portland, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

RUDMAN, Justice.

Michael M. Boucher appeals from his conviction of murder, 17 M.R.S.A. § 2651 [1], entered on a jury verdict in the Superior Court (Kennebec County, *Chandler, J.*). The murder occurred on September 16, 1973. The victim's body was found beside her car in Litchfield later that day. A pathologist testified that she had been beaten and strangled and that some of her wounds suggested that the weapon was a carpenter's hammer. The State connected Boucher to the incident with his own statements to various people over approximately 13 years. He was convicted on July 16, 1992, and sentenced to life imprisonment.

### Privilege and Waiver

◼ We first address Boucher's contention that the trial court abused its discretion in admitting the testimony of Boucher's two ex-wives, Anita Boucher (Anita) and Norma Boucar, finding that Boucher had waived the marital privilege [2] by revealing in non-privileged communications much of what he had told them. *See State v. Dechaine*, 572 A.2d 130, 133 (Me.1990) (explaining abuse of discretion standard as applied to the admissibility of evidence). Maine Rule of Evidence 510 provides:

A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while

holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

Following a voir dire proceeding on the State's motion in limine, during which the court heard the testimony of Anita, Norma Boucar, Anita's sister and brother-in-law, Boucher's half-sister, and a former co-patient with Boucher at a substance abuse treatment center, the trial court stated that Boucher had revealed "a significant portion of the privileged communications" and thus had waived the privilege. The court heard testimony that Boucher had acknowledged that he had killed a girl who would have been the age of Anita's sister and revealed that Anita had helped him in some unspecified way. The trial court found that in disclosing to third parties the "key element" of his communications to Anita and Boucar Boucher waived protection as to all communications relating to the incident. The record in this case does not compel a finding to the contrary.

◼ Nor did the court abuse its discretion in admitting the testimony of a former co-patient with Boucher at a substance abuse treatment center. The witness testified to statements Boucher made to him outside the context of group therapy. The psychotherapist-patient privilege, M.R.Evid. 503 [3], does

---

1. Because the murder occurred in 1973, the pre-Code murder statute was applied. It read: "Whoever unlawfully kills a human being with malice aforethought, either express or implied, is guilty of murder and shall be punished by imprisonment for life." 17 M.R.S.A. § 2651. The Maine Criminal Code provides, "When it is alleged that an element occurred 'on or about' any date prior to the effective date of the code [May 1, 1976], the prosecution shall be governed by the prior law." 17–A.M.R.S.A. § 1(1) (West 1983).

2. **RULE 504. HUSBAND–WIFE PRIVILEGE.**

 (a) **Definition.** A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to other person.
 (b) **General Rule of Privilege.** A married person has a privilege to prevent his or her spouse from testifying as to any confidential communication from such person to the spouse.

(c) **Who May Claim the Privilege.** The privilege may be claimed by the person who made the communication or by the spouse in his or her behalf. The authority of the spouse to do so is presumed.
 (d) **Exception.** There is no privilege under this rule in a proceeding in which one spouse is charged with a crime against the person or property of (1) the other, (2) a child of either, (3) any person residing in the household of either, or (4) a third person committed in the course of committing a crime against any of them; or in a civil proceeding in which the spouses are adverse parties.
M.R.Evid. 504.

3. M.R.Evid. 503 reads in pertinent part:

 (b) **General Rule of Privilege.** A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug

not cover such a communication. *See State v. Boobar*, 637 A.2d 1162 (Me.1994) (finding the privilege did not extend to disclosures made to peer counselors or in self-help groups).

### *Rule 804(b)(3)*

We turn to the question whether the trial court erred in excluding certain statements of Howard Johnson, whom the police investigated soon after the murder, on the grounds that the statements lacked sufficient indicia of trustworthiness pursuant to M.R.Evid. 804(b)(3)[4].

The court properly divided the questions pertaining to the admissibility of Johnson's statements and the admissibility of evidence related to the investigation of Johnson. It analyzed the admissibility of Johnson's statements pursuant to M.R.Evid. 804(b)(3), and the admissibility of evidence pertaining to Johnson as an alternate suspect pursuant to *State v. Dechaine*, 572 A.2d 130 (Me.1990). We review only the 804(b)(3) ruling, as evidence pertaining to the investigation was admitted. We review for abuse of discretion. *State v. Priest*, 617 A.2d 537, 538 (Me.1992).

The court held a voir dire hearing on the admissibility of Johnson's statements. Terrence St. John, at the time of the incident a Portland police officer, testified that on September 18, 1973, Howard Johnson approached him and another officer in a Portland restaurant. Johnson's behavior was strange, and his statements were somewhat disjointed and incoherent. Nonetheless, a number of statements and discoveries led the police to investigate Johnson as a possible suspect. Specifically, he spoke of having buried some hammers, and of having had a fight with a woman in Lewiston. He gave a description of this woman's age, hair color and clothing that approximated the description of the victim.

The most coherent core of Johnson's *statements* was that he had had a fight in Lewiston with a woman whose description matched in some respects the victim of a recent crime. Surrounding this were a number of incoherent remarks, including that he had buried a number of items because they were "monkey business," that one of these items was the watch of his dead brother, and that he had done this because too many people were being hurt and killed. There is no indication that Johnson knew that these statements would subject him to liability. *See United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir.1978) ("While the reach of Rule 804(b)(3) is not limited to direct confessions of criminal responsibility . . . the declarant's statements must, in a real and tangible way, subject him to criminal liability.") (Citation omitted).

The trial court rested its decision on a careful analysis of the trustworthiness of the statements. The court found the circumstances in which the statements were made to indicate that they were not trustworthy. The court specifically considered Johnson's appearance and manner when he approached the officers, that many of his statements were simply "off the wall," and that many were simply incorrect. The court stated that the circumstances "strongly indicate that any rational person would place absolutely no trust in these statements of Mr. Johnson at all."

addiction, among himself, his physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

4. M.R.Evid. 804(b)(3) provides:
**(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement of confession offered against the accused in a criminal case, made by a codefendant or other person implicating both himself and the accused, is not within this exception.

In *State v. Priest,* we reiterated the factors for consideration of the third prong of 804(b)(3), the trustworthiness factor. They are:

(1) the time of the declaration and the party to whom it was made;

(2) the existence of corroborating evidence in the case;

(3) whether the declaration is inherently inconsistent with the accused's guilt; and

(4) whether at the time of the incriminating statement the declarant had any probable motive to falsify.

*State v. Priest,* 617 A.2d at 539. The court in the instant case could have found the bulk of the evidence uncorroborative of the statements. The potentially inculpatory statements were buried within comments to the officers that either made no sense or contradicted the incriminating ones. For example, Johnson described being in a park in Lewiston, but the description he gave was most likely of a park in Portland. In a subsequent interview, Johnson said he had been in Camden the day before he approached the officers, and that he had never been in Lewiston. William Gene Bickford, who then worked for the Maine State Police, testified, based on a report written by a now-deceased officer, that an investigation determined that the tire treads on Johnson's vehicle did not match those at the crime scene. With nothing to connect Johnson to the crime, Bickford said, Johnson was dismissed as a suspect.

■ The question of admissibility pursuant to Rule 804(b)(3), however, is committed to the discretion of the trial court. *United States v. Hoyos,* 573 F.2d at 1115. In *United States v. Barrett,* the First Circuit stated with respect to the federal rule:

[T]here is no question but that Congress meant to preclude reception of exculpatory hearsay statements against penal interest unless accompanied by circumstances solidly indicating trustworthiness. This requirement goes beyond minimal corroboration. Trial judges will have to make an assessment case by case.... In cases that are open to reasonable differences, this court is unlikely to substitute its judgment for that of the district court.

*United States v. Barrett,* 539 F.2d 244, 253 (1st Cir.1976). *See also State v. Smith,* 415 A.2d 553, 560 (Me.1980); *United States v. Hoyos,* 573 F.2d at 1115. We cannot conclude in the instant case that the trial court abused its discretion in.excluding the statements.

■ Even if the court erred in not admitting the statements, much of the evidence Boucher sought to introduce pursuant to Rule 804(b)(3) came in anyway and was properly considered by the jury as to whether there was reasonable doubt as to Boucher's guilt. While the *statements* of Johnson would have made it clear why and how the police began their investigation of him, it is highly probable that their exclusion did not affect the judgment. Through the testimony of St. John, the jury learned that Johnson had told the police he had thrown away a couple of hammers and that the police had in fact found one that was determined to have a small bloodstain on it. They learned that Johnson's car was found to have blue paint on one of its fenders (the victim's car was blue), and that the police found a bloodstained sportscoat they believed to be Johnson's. Perhaps most important, the jury learned that the police investigation that dismissed Johnson as a suspect may not have been completely thorough. An officer testified that, contrary to the report described by Bickford, he did not recall conducting any tests pertaining to this case and, specifically, had not run a test on the tire treads of Johnson's car. The jury had evidence, then, to suggest that the police had no affirmative reason to exclude Johnson as a suspect. The jury had ample foundation on which to base a reasonable doubt as to Boucher's culpability.

Boucher's own statements and actions, however, provided the jury a credible link between him and the crime. Anita's testimony was perhaps the most critical. She testified that Boucher came home drunk and bloody the night of the murder. Several days later, while cleaning out his car, she found a letter in the back seat signed by the victim. She testified that Boucher once threw a hammer she found in the car into a river. She stated that Boucher on one occasion began to punch her and told her she

would end up the same way if she said anything, and then told her he had beaten a girl with a hammer and used her shirt to wipe the steering wheel. He told her he had beaten her unconscious and, when she started coming to, beat her again until her eye popped out, and that this had occurred in a wooded area near where he had once lived with a foster family. Anita also stated that Boucher referred to the incident in a variety of ways approximately eight times over a period of years. The jury heard from a number of other witnesses whose accounts differed as to many details but for the most part contained a consistent thread—Boucher stating that he had killed a young woman. From these accounts, the jury could have found that Boucher in fact was guilty.

### *Remaining arguments*

 We turn to Boucher's remaining arguments on appeal. Boucher challenges the court's admission of the testimony of his probation officer on the grounds that her questioning of him without providing a *Miranda* warning violated his rights against self-incrimination. Boucher failed to preserve this argument by not filing a timely motion to suppress. Boucher suggests that the State's loss or destruction of certain evidence deprived him of a fair trial. As some of this evidence was available in comparable formats (e.g., recordings of interviews available in transcript form), some related to individuals long ago excluded as suspects and thus was evidence the police had no obligation to retain, and as Boucher can point to no prejudice resulting from this missing evidence, we conclude Boucher was not deprived of a fair trial. Those arguments raised by Boucher's *pro se* brief that are not duplicative of his attorney's do not merit comment.

The entry is:

Judgment affirmed.

All concurring.