2000 ME 78

**STATE of Maine**

v.

**Albert P. COCHRAN.**

Supreme Judicial Court of Maine.

Argued April 4, 2000.
Decided May 5, 2000.

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), William R. Stokes, Asst. Attorney General, Thomas L. Goodwin, Asst. Attorney General, Augusta, for State.

John D. Pelletier (orally), Goodspeed & O'Donnell, Augusta, M. Michaela Murphy, Daviau, Jabar & Batten, Waterville, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY and CALKINS, JJ.

CALKINS, J.

[¶ 1] Albert P. Cochran appeals from a judgment of conviction entered in the Superior Court (Somerset County, *Mead, J.*) following a guilty verdict by a jury on one count of criminal homicide in the first degree pursuant to 17–A M.R.S.A. § 201 (Pamph.1976), P.L.1975, ch. 499, § 201.[1] Cochran argues that the trial court erred by excluding the hearsay statement against interest of an unavailable declarant; by refusing to change venue from Penobscot County; and by denying his motion for a mistrial on the ground that unfairly prejudicial evidence was admitted. We affirm the judgment.

[¶ 2] The body of Janet Baxter was discovered late on the night of November 23, 1976, in Norridgewock. Baxter was seen at the A & P Supermarket in Waterville at 10:00 P.M. where she had driven from her home in her boyfriend's Ford LTD. A motorist saw the Ford LTD off the River Road near the bank of the Kennebec River and reported it to the police at 11:15 P.M. The police chief went to the scene, had the Ford towed back onto the road and searched the car. He found Baxter's body in the trunk; she was clad only in a shirt bunched around her neck and socks.

[¶ 3] The medical examiner performed an autopsy the next day and found that Baxter had been shot in the head and chest. The examiner noted that a "copious" amount of semen was found in her vulva and vagina, and samples of the semen were preserved. Ballistic tests on the two bullets removed from Baxter's body determined that the murder weapon was a .22 caliber Rohm handgun. The gun manufacturer believed that only fourteen Rohm handguns were in Maine. The police located and tested twelve of these guns, and none were the murder weapon. One of the unaccounted guns was believed to have been stolen from a construction site where Cochran worked in October 1976, and Cochran had expressed an interest in the gun to a co-worker. The murder weapon has never been found.

[¶ 4] The police questioned Cochran about Baxter's murder. He denied any involvement in the murder and denied knowing Baxter. He said that on the night of the murder he had been drinking and smoking marijuana with three strangers in the parking lot of a Waterville bar; that he and the three strangers drove in two cars to the Waterville A & P, where Cochran parked his car and left with the strangers in the other car. He parted company with the strangers in Skowhegan and walked to his brother's house. A warrant to seize head and pubic hairs from Cochran was obtained and executed. The hairs apparently did not match the hairs found with Baxter's body. Cochran was not charged with murder, and he later moved to Florida.

[¶ 5] In late 1997, DNA testing was done on the samples of semen found in Baxter's body and on the hairs taken from Cochran. The analyst determined that they matched. A warrant was issued, and Cochran was arrested in Florida on March 17, 1998, for Baxter's murder. He was returned to Maine, and pursuant to a court order, the State obtained samples of blood from Cochran. The DNA analysis of Cochran's blood and the semen taken from Baxter's body demonstrated that Cochran was the source of the semen.[2] The semen samples from nine separate loci all matched Coch-

---

1. Cochran was sentenced to life imprisonment.

2. The evidence given at trial by the State's expert was that the chance that the semen came from someone other than Cochran was one in 146 quadrillion.

ran's blood, and in the opinion of the State's expert, ruled out the possibility of multiple donors of the semen. Cochran continued to deny that he knew Baxter, or had sex with her, or was involved with her murder.

## I. EXCLUSION OF EVIDENCE

### A. Cochran's Defense

[¶ 6] Cochran's defense was that someone else murdered Baxter. He presented a number of witnesses to support this defense. Skip Kelley testified that he was an eye witness to the murder of Baxter. Kelley was acquainted with Perley Doyon, Armand Boudreau, Galen Lessard, and Alan Pelletier in the mid–1970s. He delivered drugs and other items for Doyon. According to Kelley, Doyon ran an illegal garage where he altered vehicle identification numbers on cars. Kelley testified that on the night of Baxter's murder he was with Doyon in the office of the garage. Doyon told Boudreau and Lessard "to go do what they had to do." Pelletier arrived with a satchel containing money for drugs, and Doyon counted the money. At that time a blue car drove into the garage. Boudreau was the driver, and Baxter was in the passenger seat. Another car followed, driven by Lessard. Kelley testified that he heard talking and laughing, and he saw Boudreau, Lessard, and Pelletier, one after the other, have sex with Baxter in the back seat of the first car. Kelley testified that he saw Doyon pull a gun from under his shirt, exit the office, and order Boudreau, Lessard, and Pelletier to stand against the wall. Doyon then dragged Baxter out of the car and shot her twice. Kelley, who said he saw this from the window in the office overlooking the garage, exited the office and walked over to the car where he saw Baxter with blood coming from her nose, mouth, and chest.

Kelley went back to the office partition, took money that he was owed and left. Kelley testified that he did not know Cochran and that Cochran was not at the garage that night. He also testified that a few weeks earlier Baxter had asked Kelley if she could borrow money from him because she owed a drug debt to Doyon.

[¶ 7] Two State Police detectives and a Waterville police officer, who had investigated the Baxter murder at different times during the period from 1977 to 1998, testified that they had considered Doyon, Boudreau, Lessard, and Pelletier as suspects. Two of the officers said that Boudreau resembled a composite sketch that was based upon the description of a witness, Clarice Merrill, of a man she had seen in a Ford LTD with a woman. Merrill had seen the man and woman on the night that Baxter's body was discovered and on the River Road, near the location where the body was found. Merrill, who testified at trial, also saw a yellow Volkswagen, with the word "Bug" written on it, stop on the River Road near the Ford LTD, and she saw two men exit the Volkswagen. Witnesses testified that Doyon, Boudreau, Lessard, and Pelletier were friends, and Doyon was the leader of the group. Lessard's ex-wife testified that she and Lessard owned a yellow Volkswagen with the word "Bug" written on it.

[¶ 8] Dawnann Roberts testified that she was at a garage in 1979 with Doyon, Boudreau, and others. According to Roberts, Boudreau bragged about killing two women, and he said that one had been "fucked to death" and put in the trunk of a car. Roberts testified that Boudreau said that Doyon paid Pelletier to do the killings because the women owed him drug money.[3]

---

3. Some officers suspected that there may have been a connection between Baxter's murder and an unsolved 1971 murder of a Colby coed. In the mid–1980s Pelletier was tried for the Colby student's murder and found not guilty. Pelletier testified as a rebuttal witness for the State in Cochran's trial. Pelletier denied the accusations by Kelley and Roberts.

## B. Offer of Gidney Testimony

[¶ 9] Cochran offered the videotaped testimony of Mary Gidney, but the court sustained the State's objection to the testimony and ruled it inadmissible. Gidney testified that in late 1976 when she was the bartender at a Waterville restaurant, Doyon and Lessard came into the restaurant. Gidney knew both of them and had gone to school with Doyon. Gidney said Doyon had been drinking and walked "kind of macho" up to the bar where he used the telephone located on the bar. There was no one else at the bar. Gidney overheard Doyon say into the telephone that they had taken care of the Volkswagen and the woman they killed was in the trunk of a car. Gidney did not know to whom Doyon was talking. She also heard him say something about the location of a gun, but she could not remember what that was. She also testified that more than once Doyon said they got away with murder, and she acknowledged that the reason she remembered that statement was because "they would gather in the corner and say well, they got away with murder." Doyon's telephone conversation upset Gidney, and she asked him to leave. She first told the police about this conversation in 1987.

## C. Rule 804(b)(3)

 [¶ 10] The State objected to Gidney's testimony on the ground that it was hearsay and did not come within the exception created by M.R. Evid. 804(b)(3).[4] We review the exclusion of a hearsay

statement under Rule 804(b)(3) for an abuse of discretion. *See State v. Boucher*, 652 A.2d 76, 78 (Me.1994).

[¶ 11] Rule 804(b)(3) sets forth a three-prong test for the admissibility of an out-of-court statement against interest:

(1) the declarant must be unavailable as a witness; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in [his] position would not have made the statement unless [he] believed it to be true; and (3) the statement must be corroborated by circumstances that "clearly" indicate its trustworthiness.

*State v. Long*, 656 A.2d 1228, 1230 (Me. 1995) (quoting *State v. Smith*, 415 A.2d 553, 559–61 (Me.1980)).

 [¶ 12] The first prong is satisfied because the State concedes that Doyon is dead. The second prong means that Doyon's statement must have exposed him "in a real and tangible way" to criminal liability. *Boucher*, 652 A.2d at 78, (quoting *United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir.1978)). Furthermore, a reasonable person in Doyon's position would not have made the statement unless he believed it to be true. *See Smith*, 415 A.2d at 560. With regard to the third prong, the trustworthiness prong, there are four factors we consider:

(1) the time of the declaration and the party to whom it was made;

(2) the existence of corroborating evidence in the case;

---

4. The relevant portion of the rule reads:

> **(b) Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable

person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. A statement or confession offered against the accused in a criminal case, made by a codefendant or other person implicating both the declarant and the accused, is not within this exception.

M.R. Evid. 804(b)(3).

(3) whether the declaration is inherently inconsistent with the accused's guilt; and

(4) whether at the time of the incriminating statement the declarant had any probable motive to falsify.

*Boucher*, 652 A.2d at 79.

[¶ 13] The trial court relied on the second prong in excluding the evidence. It found that Doyon's statement did not meet the rule because, as an overheard statement and one not made directly to Gidney, it did not have the same trustworthiness as a direct statement. The court reasoned that an overheard statement could not be as trustworthy as one made when the intended listener recognized that the speaker exposed himself to criminal liability.

■ [¶ 14] In determining whether the second prong has been met, the circumstances surrounding the statement are essential. Indeed, the context in which a statement is made can reveal as much about it as the words used. An important contextual fact is missing for Doyon's statement in that it is not known to whom Doyon was speaking on the telephone. Therefore, we do not know whether the statement to the unknown person was exposing Doyon to criminal liability in a "real and tangible way." Because the recipient of the statement is unknown it is difficult to even speculate as to whether Doyon believed the statement to be true. Even assuming that Doyon knew that Gidney could overhear his conversation, it is not possible to infer that he made the statements knowing they were true. The facts surrounding Doyon's telephone conversation do not support a finding that Doyon was exposing himself to criminal liability.

■ [¶ 15] Concerning the truthfulness prong and the first of the four factors considered for that prong, Gidney testified that the conversation took place sometime in late 1976, and we have already noted that the person on the receiving end of the conversation is not known. For the second factor, there is corroborating evidence

in the form of Kelley's testimony about seeing Doyon shoot Baxter; the testimony of the police officers who found Baxter's body in the trunk of a car; and the testimony of Merrill about a Volkswagen that stopped near a Ford LTD on the night Baxter's body was found. The State argues that Kelley's testimony was incredible, but whether Kelley was truthful was for the jury to determine. For this evidentiary issue it is sufficient that the corroborating evidence is presented. *See People v. Swaggirt*, 282 Ill.App.3d 692, 218 Ill.Dec. 150, 668 N.E.2d 634, 641 (1996).

[¶ 16] Considering the third factor, Doyon's statement is inherently inconsistent with Cochran's guilt. Although it could be inferred from Doyon's statement that he and one or more people killed a woman, there was no suggestion during the trial that Doyon and Cochran acted together or that Cochran acted with anyone in murdering Baxter. With regard to the final factor to be considered in determining the trustworthiness of the statement, there is no information as to whether Doyon had any probable motive to lie about killing the woman or stating that her body was in a car trunk. It is possible that Doyon was talking to a criminal cohort and indulging in braggadocio. *See United States v. Seabolt*, 958 F.2d 231, 233 (8th Cir.1992). Conversely, Doyon could have been speaking with a friend, in which case the statement is more likely to be true. *See Swaggirt*, 218 Ill.Dec. 150, 668 N.E.2d at 640. Ultimately we cannot say that these circumstances show whether Doyon had any motive to lie when making the challenged statement.

[¶ 17] Considering the four trustworthiness factors, the trustworthiness of Doyon's statement is not apparent. While two of the factors indicate trustworthiness, two of the factors do not support a finding of trustworthiness because we have no information on them. Thus, we cannot say that the surrounding circumstances of the statement "clearly" indicate its trustworthiness. *See* M.R. Evid. 804(b)(3). In

light of the fact that neither the second nor the third prong of the rule are met, the court did not err in excluding Gidney's testimony.

## II. MOTION TO CHANGE VENUE

[¶ 18] This offense occurred in Somerset County. Cochran's motion to change the place of trial from Somerset County was granted. By memorandum dated December 21, 1998, the judge informed the parties that the trial would be held in Bangor starting May 10, 1999. Cochran then made a request to have the place of trial changed from Bangor. The court heard argument on this request on March 30, 1999. Cochran produced seventeen articles discussing his case; all came from the *Bangor Daily News;* and all were published between March 18, 1998, and September 24, 1998. Cochran did not introduce any evidence of television or radio coverage of his case. Cochran's request to move the trial from Bangor was denied.

[¶ 19] After the jury was selected, Cochran renewed his motion for a change of venue and submitted one additional newspaper article, published in the *Bangor Daily News* on May 8, 1999. This article announced that the Cochran trial would start on Monday. It reviewed the events of the Baxter murder and the DNA testing. It also stated that Cochran had served nine years in jail in Illinois for stabbing his estranged wife and that he had confessed to killing his three children because they witnessed him murder his wife. It also said he was suspected in the disappearance of a Maine woman with whom he was residing at the time of Baxter's murder. The court again denied the motion.

 [¶ 20] We review a denial of a motion to change venue for abuse of discretion. We do not overturn a court's decision on venue unless it has abused its discretion or "there exists facts demonstrating 'intensive and extensive pretrial publicity of an invidious nature tending to

arouse general ill will and vindictiveness against the accused.'" *State v. Cooper,* 617 A.2d 1011, 1014 (Me.1992) (quoting *State v. Addington,* 518 A.2d 449, 451 (Me. 1986)).

 [¶ 21] A change of venue is required upon the showing of (1) presumed prejudice due to extensive and pervasive media coverage of a case, or (2) actual prejudice among the jury venire. *See State v. Chesnel,* 1999 ME 120, ¶ 5, 734 A.2d 1131, 1134. Prejudice is presumed when the defendant demonstrates that the pretrial publicity has "the immediacy, the intensity, or the invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of jury selection." *Id.* at ¶ 7, 734 A.2d at 1134–35. Actual prejudice is not proven by focusing on the number of prospective jurors who know about the case. *See State v. Corson,* 572 A.2d 483, 485 (Me.1990). The burden is on the defendant to present the evidence demonstrating prejudice. *See Addington,* 518 A.2d at 451.

 [¶ 22] Cochran has failed to demonstrate actual prejudice. Jury selection took place on May 10, 1999, and 138 potential jurors appeared. The first question that the court asked the venire was whether anyone knew anything about the case either from personal knowledge or from reading, viewing, or hearing something about the case. The 47 potential jurors who responded affirmatively were taken into another courtroom. Soon thereafter the court excused for cause all 47 prospective jurors who had indicated that they knew something about the case. There were 91 remaining potential jurors who did not know anything about the case. Therefore, there was no actual prejudice from the pretrial publicity.

 [¶ 23] Cochran has not demonstrated presumed prejudice because he failed to show that the immediacy, intensity, or invidiousness of the pretrial publicity so tainted the atmosphere as to deprive him of a fair trial. The news articles

originally submitted to the court were several months old, and therefore, they lack immediacy. Of the seventeen articles, only five appear to be front page articles, and all of the front page articles are from March 1998, over a year before jury selection. Most of the articles are factual reporting of the events in the court proceedings, such as Cochran's arrest in Florida, the waiver of extradition, the arraignment, and problems surrounding the appointment of counsel. Other articles reported on pretrial motions, and one article was about DNA testing in Maine, with only a passing reference to Cochran. Cochran has not demonstrated from these seventeen articles the "intensity or invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of jury selection."

[¶ 24] The May 8 newspaper article tying Cochran to the commission of other murders is both immediate and the type of publicity likely to generate ill will toward a defendant. Because it is only one article and it did not appear as a front page story, it does not meet the intensity or pervasiveness requirement for a presumption of prejudice, even when viewed as a whole with the other seventeen articles, the most recent of which appeared eight months earlier. More importantly, by the time the May 8 article was called to the court's attention, all potential jurors who had heard or read anything about the case had been excused for cause. The jury had been chosen, and it consisted of twelve members and three alternates who had not heard of the case. The trial court did not abuse its discretion in denying Cochran's request to move the trial from Bangor.

## III. MOTION FOR MISTRIAL

[¶ 25] Cochran moved for a mistrial on the ground that one of the State's witnesses testified that Cochran was on parole. Cochran concedes that the testimony was not obtained by prosecutorial misconduct or in bad faith.

[¶ 26] The State called Cochran's brother, Alfred, to testify. On redirect examination, the prosecutor asked Alfred about the interest shown by Cochran in Baxter's murder. Alfred said that Cochran was interested and read the paper. The prosecutor then asked if Alfred could explain why Cochran denied any interest in the murder when he was arrested in 1998. Alfred responded:

> The only thing I could say is it might have happened, sir, if he got picked up and somebody thought that he might have had something to do with it, *and where he was on parole*, he might be just a little bit nervous about everything. I mean, I know I would be.

No objection was made to the testimony. The prosecutor changed the subject by asking Alfred whether Cochran was neat and clean.

[¶ 27] The next day, after Alfred's testimony was completed and two other witnesses testified, Cochran moved for a mistrial because of the reference to parole.[5] The judge said he had not heard the mention of parole, and he took the motion under advisement to review the transcript. The next day, after reviewing the transcript and noting that no jurors had visibly reacted to the statement, the court denied the mistrial motion. The court found the mention of parole to be unresponsive, a quick reference and fairly innocuous. Cochran requested that no curative instruction be given, and none was given.

[¶ 28] We review a decision denying a motion for a mistrial for abuse of discretion. *See State v. Clarke*, 1999 ME 141, ¶ 17, 738 A.2d 1233, 1236. Furthermore, we overrule a denial of a mistrial motion only in the event of "exceptionally prejudicial circumstances or prosecutorial bad faith." *State v. Ardolino*, 1997 ME 141, ¶ 16, 697 A.2d 73, 79.

5. Cochran was on parole in 1976 for a manslaughter conviction in Illinois.

[¶ 29] Alfred's brief, nonresponsive remark was so innocuous that it was unnoticed by the trial court and apparently unobserved by the jury. We must give deference to the trial court's determination because it was able to gauge the impact, or lack of impact, on the jury of the brief mention of parole. *See State v. Weidul,* 649 A.2d 318, 319 (Me.1994) (affirming denial of mistrial when witness answered a question nonresponsively and mentioned the defendant's prior jail sentence); *State v. Libby,* 435 A.2d 1075, 1078 (Me.1981) (affirming denial of mistrial and stating that trial judge could infer that defense counsel viewed the challenged statement of little consequence, because counsel waited until the State rested to move for a mistrial). Neither exceptionally prejudicial circumstances nor prosecutorial bad faith are present, and we cannot say that the trial court abused its discretion in denying Cochran's motion for a mistrial.

The entry is:

Judgment affirmed.