MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2020 ME 105
Docket:       Aro-19-334
Argued:       June 24, 2020
Decided:      August 13, 2020
Revised:      December 31, 2020

Panel:        MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

JAMES P. PEASLEE

HUMPHREY, J.

[¶1]  James P. Peaslee appeals from a judgment of conviction of one count of murder, 17-A M.R.S. § 201(1)(A) (2020), entered by the trial court (Aroostook County, *Stewart, J.*) after a jury trial.  Peaslee argues that the court abused its discretion by admitting the lay opinion testimony of three law enforcement officers identifying him as the person shown on home security camera footage recovered from the victim's residence.  *See* M.R. Evid. 701. Peaslee also argues that the court abused its discretion by denying his motion for a new trial based on newly discovered evidence, *see* M.R.U. Crim. P. 33, specifically, an alleged admission by Peaslee's brother that he committed the murder for which Peaslee was convicted.  We affirm the judgment.

## I. BACKGROUND

[¶2] Viewing the evidence in the light most favorable to the verdict, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.

[¶3] The victim, Peaslee's stepfather, inherited a significant portion of Peaslee's mother's estate, including her home in Bridgewater, when Peaslee's mother died without a will. Peaslee was angry that the victim had inherited his mother's home. After Peaslee's mother's death, the victim, who lived alone, had a home security system installed, which included video monitoring and recording of the interior and exterior of the home.

[¶4] On January 17, 2018, Peaslee approached the victim's home on foot, went up the front steps, knocked on the door, and then fired four shots through the screen door with a .380 caliber handgun, hitting the victim once in the chest and killing him.[1] The shooting was captured on video by the victim's home security system, and three local law enforcement officers who knew Peaslee

---

[1] Although the murder weapon was never recovered, the evidence showed that Peaslee had acquired a .380 caliber handgun on the day of the murder, and his fingerprints were found on the tray inside a box of .380 caliber bullets discovered at his home. Moreover, the evidence showed that the bullets found at his home were the same make as the casings recovered from the crime scene.

and his brother identified Peaslee as the shooter in the video.[2]  While awaiting trial at the Aroostook County Jail, Peaslee made a detailed confession to another inmate, explaining that he had shot the victim because of the dispute over the Bridgewater property and describing how he had done so.[3]  The inmate's testimony at trial was consistent with the other evidence presented, including the video of the shooting.

[¶5]  Peaslee was charged by indictment with one count of intentional or knowing murder, 17-A M.R.S. § 201(1)(A), on February 8, 2018.  The case proceeded to a jury trial at the beginning of June 2019.

[¶6]  Before trial, Peaslee filed a motion in limine to exclude the lay opinion testimony of the three law enforcement officers who would identify him as the shooter shown in the home security camera footage recovered from the victim's residence.  *See* M.R. Evid. 701.  Following voir dire examination of these three witnesses, the court determined that each of them possessed

---

[2]  One of these witnesses testified that not only did he recognize Peaslee, he also recognized the jacket Peaslee was wearing in the video of the shooting as one he had seen Peaslee wearing previously.

[3]  Peaslee also told the inmate that he had attempted to create an alibi by going to a convenience store in Mars Hill wearing different clothing before he went to the victim's home, and that after the shooting he had driven towards Limestone, thrown the gun in the woods, changed his clothes back to the ones he had been wearing when he went to the convenience store, and wiped his right hand with bleach.  Peaslee stated that he intended to make it look like his brother had committed the murder.

4

sufficient relevant familiarity with the defendant to offer lay opinion testimony, *State v. Miller*, 1999 ME 182, ¶ 9, 741 A.2d 448, because they had each lived in the same community as Peaslee for many years, had seen him at a distance numerous times, and had interacted with him face-to-face on multiple occasions.[4] The court denied Peaslee's motion after concluding that lay opinion testimony from these witnesses concerning the identity of the shooter in the video would be helpful to the jury because the video was not unmistakably clear. *Id.*; M.R. Evid. 701.

[¶7] The trial was held over three days in June of 2019. The jury returned a guilty verdict on the sole count of intentional or knowing murder, 17-A M.R.S. § 201(1)(A), on June 11, 2019.

[¶8] On September 16, 2019, while awaiting sentencing, Peaslee filed a motion for a new trial based on newly discovered evidence—a statement allegedly made by Peaslee's brother in the presence of another individual, in which Peaslee's brother claimed responsibility for the victim's murder. *See* M.R.U. Crim. P. 33. After a hearing, the court denied Peaslee's motion based on

---

[4] To minimize the potential danger of unfair prejudice, the court ordered the State not to elicit testimony from these witnesses concerning interactions they may have had with Peaslee in a law enforcement or professional capacity—e.g., previous arrests, interrogations, or traffic stops involving Peaslee. *See* M.R. Evid. 403.

its determination that the brother's statement would not be admissible in a new trial,[5] and further concluded that even if the statement were admissible, Peaslee failed to establish to a clear and convincing standard that the proffered evidence would probably change the result if a new trial were granted. *See State v. Twardus*, 2013 ME 74, ¶¶ 29-30, 72 A.3d 523.

[¶9] Peaslee was sentenced to sixty years in prison[6] and, thereafter, timely appealed. 15 M.R.S. § 2115 (2020); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

### A. Lay Opinion Testimony

[¶10] Peaslee first argues that the court "erred in permitting law enforcement officers to testify about their opinion[s] that . . . Peaslee was the individual depicted in the video of the shooting" because the video was so clear that the jury could have determined without the officers' testimony whether Peaslee was the individual shown. Peaslee also contends that even if the officers' lay opinion testimony "satisfied the foundational requirements for

---

[5] Because Peaslee's brother was unavailable to testify, the court analyzed whether the statement would be admissible through the witness who overheard the statement as a statement against interest by the brother. M.R. Evid. 804(b)(3).

[6] Peaslee was also ordered to pay a fine of $35 and $4,200 in restitution to the Victims' Compensation Fund. 5 M.R.S. § 3360-I (2020). He does not challenge his sentence on appeal.

6

admission, the probative value of this evidence was substantially outweighed by the danger of unfair prejudice."

[¶11]  We review the court's admission of lay opinion testimony for an abuse of discretion.  *State v. Patton*, 2012 ME 101, ¶ 20, 50 A.3d 544.  Lay opinion testimony concerning the identity of someone shown on a video recording "must be relevant, rationally based on the witness's own observations, and helpful to the jury."  *Miller*, 1999 ME 182, ¶ 9, 741 A.2d 448; M.R. Evid. 701.  In general, these elements are present where "the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the [video is] not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification."  *Miller*, 1999 ME 182, ¶ 9, 741 A.2d 448 (quotation marks omitted).  "Of paramount importance in determining whether the witness's opinion will be helpful to the factfinder is the witness's opportunity to observe the defendant in different settings, in different lighting, and under different circumstances than the jury . . . ."  *Id.* ¶ 10.

[¶12]  The law enforcement witnesses all testified that they knew Peaslee and his family because they had lived in the same small and sparsely populated community for at least twenty years, and, although the frequency of their

individual contacts with Peaslee varied, each had seen him from a moderate distance and interacted with him face-to-face on several occasions.[7] *See United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984) ("A witness's opinion concerning the identity of a person depicted in a surveillance [video] is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the [video] than is the jury.").  One of these witnesses testified that he had previously seen Peaslee wearing a jacket with a distinct patch or embroidery on the chest or shoulder on several occasions during the summer of 2017, and that the shooter in the video appeared to be wearing the same jacket.  *See United States v. Jackman*, 48 F.3d 1, 5 (1st Cir. 1995) (observing that "familiarity with the defendant in clothing similar to that worn by the person in the [video] at issue" is relevant when determining whether lay opinion testimony is admissible).  Because these law enforcement witnesses had seen and interacted with Peaslee in a variety of

---

[7] In contrast, the Court of Appeals for the Ninth Circuit held in *United States v. LaPierre*, a case cited by Peaslee, that the trial court abused its discretion when it admitted lay opinion testimony by a police officer identifying the defendant in a photograph because the officer did not know the defendant, had never seen him before in person, and based his identification entirely on his review of photographs and witness descriptions.  998 F.2d 1460, 1465 (9th Cir. 1993).  The officers here had not only seen Peaslee in person, they had had face-to-face interactions with him on several occasions. *Cf. United States v. Rodríguez-Adorno*, 695 F.3d 32, 39-40 (1st Cir. 2012) (observing that the record was not clear as to whether the law enforcement witness "had any special familiarity with the individuals that would make him better suited to make the identifications than the jurors" and assuming without deciding that his testimony was erroneously admitted).

contexts over a period of many years, they possessed a familiarity with Peaslee that the jury did not, and each had the "opportunity to observe the defendant in different settings, in different lighting, and under different circumstances than the jury." *Miller*, 1999 ME 182, ¶ 10, 741 A.2d 448.

[¶13] Turning to the question of whether this testimony was helpful to the jury, as required by M.R. Evid. 701, the trial court reviewed the home security camera video of the shooting and found that the testimony would be helpful to the jury because the video was brief, recorded at nighttime, in black and white, and the quality "is not like watching a high-definition movie." The video shows an individual move briskly into the frame toward the front steps of the victim's home, walk to the top of the steps, and stop moving, at which point his face is most visible in profile. The individual knocks on the door, raises a handgun, fires a single shot, pauses, fires three more shots in close succession, and then quickly turns away from the camera and flees back down the driveway.

[¶14] The court did not abuse its discretion in determining that, "from the standpoint of jurors who have no familiarity with the individual in the video," it is not "unmistakably clear who the person is in [that video]" or in

determining that lay opinion testimony concerning the identity of the individual shown in the video would be helpful to the jury.[8]  M.R. Evid. 701.

[¶15]  Next, Peaslee contends that even if the officers' lay opinion testimony satisfied the requirements for admission, its probative value was substantially outweighed by the danger of unfair prejudice.  M.R. Evid. 403. This argument is not persuasive.  The court precluded these witnesses from testifying about any contact they had with Peaslee in their professional capacity as law enforcement officers.[9]  *See Miller*, 1999 ME 182, ¶¶ 12-17, 741 A.2d 448.

---

[8]  Peaslee also contends that it was an abuse of discretion to admit lay opinion testimony identifying him as the shooter because one of the law enforcement witnesses testified that the video was "perfect" for identification purposes.  However, this mischaracterizes the witness's testimony. This witness stated during voir dire that he did not think the videos were extremely high quality and that "[t]here were some lighting issues in the video," but that "once . . . he changed position, the lighting got different, it was obvious who it was."  Then, in response to the question, "So, there was at least a point in the video where things were just perfect," the witness responded, "Yes."  But the very next question was, "And *anybody who would know [Peaslee] would say, yup, that's him*," to which the witness replied, "Yes."  This is precisely the kind of testimony that is helpful to the jury because the witness knew Peaslee and could readily identify him whereas someone who did not know him might be unable to.  In fact, the witness went on to testify that he did not think somebody who was not familiar with Peaslee would be comfortable making an identification from the video.  *See State v. Miller*, 1999 ME 182, ¶ 9, 741 A.2d 448.

[9]  Although Peaslee argues that he was "forced to reveal prior arrests" and contends that one of the officers "testified about a violent confrontation with the defendant when he arrested [Peaslee] in August of 2017," that testimony was elicited by the defense, not the State.  *Compare United States v. Farnsworth*, 729 F.2d 1158, 1161-62 (8th Cir. 1984), *with United States v. Sostarich*, 684 F.2d 606, 608 (8th Cir. 1982) (per curiam).  Contrary to Peaslee's contention, the alternative to inquiring about prior arrests was not to "permit the officers to testify about the identity of the shooter without challenging their credibility."  Peaslee was free to challenge the officers' credibility and the foundation for their identifications by asking about the number of their interactions with him, the length of those interactions, and the distance at which they observed him.  Peaslee was also free to challenge the officers' ability to identify him from the short, imperfect video.  We are not persuaded by Peaslee's argument that he was unfairly prejudiced by testimony he chose to elicit after the court

Moreover, we recognized in *Miller* that in these circumstances the likelihood of unfair prejudice is reduced "when [a] law enforcement witness will also testify to other facts that require the jury to understand the witness's occupation and the context of those facts." *Id.* ¶ 13. Here, the law enforcement witnesses had responded to the victim's residence on the night of the shooting and participated in the investigation. They were called to testify not just to identify Peaslee in the home security camera video, but also to explain their role in the investigation to the jury.[10] *See id.*

[¶16] The trial court did not abuse its discretion in admitting the lay opinion testimony of the three law enforcement witnesses who identified

---

had already ordered the State not to do so precisely because such testimony might be unfairly prejudicial.

[10] Peaslee relies on *Sostarich* in support of his argument that the lay opinion testimony was unfairly prejudicial, but that case involved identification testimony by a witness who testified during the prosecution's direct examination that he was familiar with the defendant because they had been incarcerated together. 684 F.2d at 608. There, because the prosecution could instead have established the witness's familiarity with the defendant by asking whether the witness had previously lived or worked with the defendant, the "incarceration testimony had no probative value." *Id.* Here, the law enforcement witnesses testified only that they knew Peaslee from having lived in the same community for many years, and omitted any reference to their professional interactions with him except when specifically asked about those interactions by the defense on cross-examination. Similarly, Peaslee's citation to *State v. Almurshidy*, 1999 ME 97, ¶ 14, 732 A.2d 280, is unavailing. There, we held that that the trial court erred in admitting a mug shot in evidence and observed that such photographs "tend[] to inform the jury that the defendant may have a prior criminal record." *Id.* ¶¶ 14, 20 (quotation marks omitted). No such concern is implicated here because the trial court prohibited the State from eliciting testimony concerning Peaslee's prior arrests or interactions with law enforcement.

Peaslee as the shooter shown in the home security video recovered from the victim's residence. *Id.* ¶¶ 12-13, 17.

B.     Motion for a New Trial Based on Newly Discovered Evidence

[¶17]    Peaslee's remaining argument is that the court abused its discretion in denying his motion for a new trial based on newly discovered evidence that in January 2018 a witness allegedly overheard Peaslee's brother say that he had committed the murder for which Peaslee was arrested and ultimately convicted.

[¶18]  "When reviewing the denial of a motion for a new trial pursuant to M.R.[U.] Crim. P. 33 on the basis of newly discovered evidence, we review the court's findings of fact for clear error and its determination of whether the defendant has met the necessary elements for an abuse of discretion." *Twardus*, 2013 ME 74, ¶ 29, 72 A.3d 523.  Motions for a new trial based on newly discovered evidence are disfavored "in light of the need for finality and for the preservation of the integrity of criminal judgments."  *Id.* (quotation marks omitted).  A defendant seeking a new trial based on newly discovered evidence must show by clear and convincing evidence that

> (1)  the evidence is such as will probably change the result if a new trial is granted;
>
> (2)  it has been discovered since the trial;

12

(3) it could not have been discovered before the trial by the exercise of due diligence;

(4) it is material to the issue; and

(5) it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

*Id.* (quotation marks omitted). A mere possibility or chance of a different verdict is insufficient; it must appear, in light of all the testimony, both new and old, that the jury ought to give a different verdict. *Id.* ¶ 30. Here, the court found—and neither party disputes—that the final four factors for obtaining a new trial were met, so the court's analysis turned on the first factor: whether the evidence would probably change the result if a new trial were granted. *Id.* ¶ 29.

[¶19] At the time of the hearing on Peaslee's motion, the court also found that the declarant—Peaslee's brother—who allegedly made the statement at issue was unavailable to testify as a witness.[11] Therefore, the court was required to first determine whether the statement would be admissible

---

[11] A psychologist who examined him in the Intensive Mental Health Unit at Maine State Prison less than a week before the hearing testified that Peaslee's brother suffered from a mental illness and, if called to testify, "his responses wouldn't [have] be[en] reality-based." Based on these mental health issues, the court determined that Peaslee's brother was unavailable to testify as a witness. *See* M.R. Evid. 804(a)(4) (providing that "[a] declarant is considered to be unavailable as a witness if the declarant . . . [c]annot be present or testify at the trial or hearing because of . . . mental illness").

through the testimony of the witness who overheard the statement as a statement against interest.  *See* M.R. Evid. 804(b)(3).

[¶20]  For an out-of-court statement to be admissible as a statement against interest in a criminal case,

> (1) the declarant must be unavailable as a witness; (2) the statement must so far tend to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement must be corroborated by circumstances that clearly indicate its trustworthiness.

*State v. Cochran*, 2000 ME 78, ¶ 11, 749 A.2d 1274 (alterations omitted) (quotation marks omitted); *see* M.R. Evid. 804(b)(3).

[¶21] Here, the court found that the declarant was unavailable, satisfying the first factor, and the court's analysis focused on the third factor.[12]  To determine whether a statement is corroborated by circumstances clearly indicating its trustworthiness, courts are instructed to consider the time of the declaration and to whom the statement was made; the existence of corroborating evidence; whether the declaration is inherently inconsistent

---

[12]  Concerning the second factor, the statement at issue, in which Peaslee's brother claimed responsibility for the victim's murder, certainly "tend[ed] to subject [him] to criminal liability."  *State v. Cochran*, 2000 ME 78, ¶ 11, 749 A.2d 1274.  However, the court questioned "whether the second [factor] of Rule 804(b)(3) [was] capable of being satisfied" because "[his] mental health condition would impair his ability to act as a reasonable person would."  We need not decide whether the second factor was capable of being satisfied because, even assuming it was satisfied, the court did not clearly err in determining that the statement was not trustworthy.  *Id.*

14

with the accused's guilt; and whether at the time of the incriminating statement the declarant had any probable motive to falsify. *Cochran*, 2000 ME 78, ¶ 12, 749 A.2d 1274.

[¶22]  Based on competent evidence in the record, the court found that at the time of the declaration, the declarant had recently stopped taking his prescription medications and was in the process of purchasing illegal drugs. The court also found that the declaration was made close in time to a January 2018 interview with law enforcement during which the declarant exhibited delusional and disorganized thinking.  Finally, the court found that the declarant was "upset, crying, and holding his head in his hands" when he spontaneously made the statement, and that the statement was not made to anyone in particular or as part of a conversation. *See id.* ¶¶ 13-14.

[¶23]  Based on these factual findings, the court concluded that neither the requirements of M.R. Evid. 804(b)(3) nor the *Cochran* factors for trustworthiness were satisfied.  The court's factual findings are not clearly erroneous, and the court did not abuse its discretion in determining that the alleged confession would not be admissible as a statement against interest in a new trial. *Cochran*, 2000 ME 78, ¶ 10, 749 A.2d 1274.  Because the statement would not have been admissible, the court did not abuse its discretion in

denying Peaslee's motion for a new trial. *Twardus*, 2013 ME 74, ¶ 29, 72 A.3d 523; M.R.U. Crim. P. 33.

[¶24] Although the court concluded that the statement would not have been admissible, the court went on to analyze Peaslee's motion for a new trial pursuant to M.R.U. Crim. P. 33 and the factors laid out in *Twardus*, 2013 ME 74, ¶ 29, 72 A.3d 523, assuming for the sake of its analysis that the statement was admissible. The court found, and neither party disputes, that the statement was not discovered until after trial, could not have been discovered before trial, was material to the issue, and was not merely cumulative or impeaching. *Id.* The court then considered whether Peaslee had established by clear and convincing evidence that the statement, if admitted, would probably have changed the result if a new trial were granted. *Id.*

[¶25] Reviewing the evidence presented to the jury, the court observed that the jury had seen video footage of the shooting, had had the opportunity to view Peaslee both in the courtroom and in photographs, and was provided a photograph of Peaslee's brother for comparison. Additionally, the evidence showed that Peaslee had acquired a .380 caliber handgun—the same caliber as the murder weapon—on the day of the murder. The tray inside a box of .380 caliber bullets found at his home had his fingerprints on it, and those bullets

were of the same make as the casings found outside the victim's residence. One witness testified that Peaslee had made a full confession to him, which he recounted in detail, and this witness's testimony was consistent with the other evidence presented at trial. Finally, the court observed, "the evidence showed Peaslee's cell phone was off during the time frame of the murder, consistent with an attempt to conceal his locations." After considering the evidence presented to the jury, the court concluded that "the magnitude of evidence demonstrating Peaslee's guilt is significant," and that, in light of the circumstances surrounding Peaslee's brother's alleged confession, it would not have changed the result if admitted in a new trial.

[¶26] The court's findings are not clearly erroneous, and the court did not abuse its discretion in determining that, even assuming the newly discovered evidence was admissible, Peaslee failed to establish by clear and convincing evidence that it would probably have changed the result if a new trial were granted. *Id.* ¶¶ 29-30; M.R.U. Crim. P. 33.

The entry is:

Judgment affirmed.

John W. Tebbetts, Esq. (orally), Tebbetts Law Office, LLC, Presque Isle, for appellant James P. Peaslee

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2018-30028
FOR CLERK REFERENCE ONLY