STATE OF MAINE                          UNIFIED CRIMINAL DOCKET
KENNEBEC, ss.                           AUGUSTA
                                        DOCKET NO. CR-14-0627


MICHAEL BOUCHER,
      Petitioner


v.                                      **ORDER ON PETITION FOR**
                                        **POST-CONVICTION REVIEW**


STATE OF MAINE,
      Respondent



   Hearing was had on March 4, 2016 with respect to the Petitioner Michael Boucher's (hereinafter "Petitioner") Petition For Post-Conviction Review as amended on November 21, 2014. After the Court has had an opportunity to review the multiple exhibits filed by both parties as well as the post-hearing memoranda of counsel, the last being filed on April 27, 2016, the Court enters the following **Order** based upon the reasoning as set forth below:

### *Procedural History:*

   1. Petitioner was indicted in 1988 by a Kennebec County Grand Jury charging the Petitioner with the murder of Debra Dill, the crime having occurred fifteen years earlier.

   2. Petitioner was convicted in 1991 after a jury trial of the murder and sentenced to life imprisonment with parole.

   3. By decision dated September 3, 1994, the Law Court affirmed the jury verdict, *see State v. Boucher,* 652 A.2d 76 (Me. 1994).

   4. Petitioner sought parole in 2001, 2006, 2011, and 2014 without success.

   5. On June 4, 2014 Petitioner filed a collateral state petition for post-conviction review pursuant to 15 M.R.S. §§ 2121-2129. Two amendments to the Petition were subsequently granted.

   6. On March 4, 2016 a testimonial hearing was held before the undersigned at which the Petitioner contended that his procedural due process

rights, his substantive due process rights, and his right to equal protection under the law were all violated. The undersigned will discuss each contention below:

*Alleged Procedural Due Process Violation:*

7. Petitioner argues that his procedural due process rights were violated when he was allegedly not told he could request to have his May 2014 parole hearing recorded and when he was allegedly not told that he could request to have a spokesperson represent him at his May 2014 hearing. The principal State witness regarding these contentions, PPO Delahanty, testified that he had no specific recollection that he affirmatively informed Petitioner that Petitioner could request that the hearing be recorded and/or that Petitioner could request to have a spokesperson represent him at the hearing, although it would have been his usual practice to so inform a prisoner as much.

8. The undersigned notes that the Petitioner did sign the Hearing Notice dated 2/7/2014 that states that Petitioner had "discussed the criteria for parole release outlined in the Initial Hearing Notice with a probation officer..." presumably PPO Delahanty. (Petitioner's Exhibits Volume A at 3). The Initial Hearing Notice informs recipients that they may request the hearing be taped and that they be allowed to request a spokesperson speak on their behalf at the hearing. (Petitioner's Exhibits Volume A at 5.)

9. The undersigned also notes that Petitioner had requested prior parole hearings be taped and that Petitioner have a spokesperson represent him at prior hearings. The undersigned finds Petitioner's explanation that he did not request the May 2014 hearing to be recorded or transcribed because he "assumed it would automatically been done because it had been done twice in the past" not credible.

10. As the State points out in its memorandum, the United States Supreme Court in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1 (1979) held that there is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence: in short, there is no constitutional "right" to parole. Parole release involves the denial of a liberty desired by inmates, and that decision depends upon an amalgam of elements, some factual but many purely subjective evaluations by a (parole) Board. *Id.*

11. However, although States are under no duty to offer parole to their prisoners, *Swarthout v. Cooke,* 562 U.S. 216 (2011), if they decide to do so, then a prisoner's "expectancy of release" created by a state parole board statute is "entitled to some measure of constitutional protection..." *Greenholtz, supra,* at 12.

12. The Petitioner in this case was provided an opportunity to be heard and was provided with reasons why his parole was denied. The undersigned agrees with the State when it argues that, even if Petitioner was not **affirmatively** told by PPO Delahanty that Petitioner could request that the hearing be recorded and that Petitioner could request a spokesperson, there is evidence in the record

2

to support the conclusion that Petitioner knew or should have known that he had those rights and chose not to invoke them. Further, Petitioner has failed to show that he was prejudiced in any way, shape, or form by the possible failure to technically comply with board rules. State statutes do not require that release hearings be taped, or that the Parole Board appoint a spokesperson to represent the parolee, and Petitioner has not cited any authority for the proposition that due process **requires** that hearings automatically be recorded and/or spokespersons be automatically appointed for parolees. The undersigned could not find any such authority as well.

13. Based upon the above, the undersigned finds that Petitioner has failed to prove any defect claimed and also that, assuming *arguendo* that such defect(s) existed, that he was prejudiced thereby. *See* 15 M.R.S. § 2125; *Mahaney v. State*, 610 A.2d 738 (Me. 1992). Accordingly, Petitioner's claim of a procedural due process violation fails.

### *Alleged Substantive Due Process Violation:*

14. The undersigned finds it to be more likely than not that Parole Board member Anderson asked the Petitioner if he would be willing to waive any future parole board release hearings in response to Petitioner's statement that he would "do anything" to ease the victim's family pain if he could. Anderson's rationale for asking such a question appears to be that Petitioner, although contending he was contrite, did not appear to be so to Anderson. After hearing of the impact of the death of the victim on the family as well as the impact on the family of "going through these (parole) hearings…" coupled with Petitioner contending he would "do anything" to ease the family's pain, Anderson felt it appropriate to inquire of Petitioner whether he literally would "do anything" to ease the pain of the victim's family, namely to "stop putting the family through these parole board hearings…"

15. The wisdom and/or appropriateness of asking such a question certainly can be questioned; however it is ridiculous to argue that the posing of one arguably inappropriate question to a parolee during a parole board release hearing should result in the release of the parolee as counsel for Petitioner suggests. None of the Board members suggested that the asking of the question or the Petitioner's frankly understandable response to it played any part whatsoever in the Board's ultimate decision to deny Petitioner's request for parole. Instead, the testimony of Attorney Duffett, a member of the Parole Board for several years who sat in on at least one prior hearing of Petitioner, the undersigned finds instructive. Attorney Duffett testified that the Board was "very familiar with Petitioner" and that "many factors go into the (parole) process that can last for years…one is acceptance of responsibility…(F)or many years Petitioner was in denial, always minimizing or even denying responsibility…(I)n 2011 Petitioner for the first time seemed to take some responsibility."

16. Attorney Duffett went on to inform the Court that the underlying murder case involved "unusual facts…the killing of an innocent stranger…".

3

Moreover, Petitioner's plan that involved his moving out of state was "usually a non-starter" in similar cases and that it would be "very unusual to release someone who has spend 25 years in prison directly into a homeless shelter" or permit them to move out of the State of Maine. The Board believed that "much community structure was needed plus plenty of opportunity for Probation and Parole to supervise the Petitioner intensely..." something that was lacking in Petitioner's plans for after his release.

17. All of the above coupled with the "lock in the sock" incident that occurred mere months before the hearing and testified to at the hearing understandably gave the Board pause, with the rational concern that any progress the Petitioner may have made had been lost. Indeed, Attorney Duffett testified at this hearing that "the incident in January (2014) caused us great concern..."

18. What the Board found to be the inadequacy of Petitioner's proposed release plan, the significant negative victim family and community sentiment, the recent assaultive behavior on the part of Petitioner, and the seriousness of Petitioner's offense certainly provided the Board with more than sufficient grounds to deny Petitioner's request for parole, and was not "arbitrary and capricious" as Petitioner contends. The undersigned finds no violation of Petitioner's substantive due process rights.

### *Alleged Equal Protection Violation:*

19. To state an Equal Protection claim, Petitioner must allege that he was intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

20. The Court finds that Petitioner has not shown that he was intentionally treated differently from other similarly situated parole applicants. The decision whether to parole someone or not is discretionary and is highly fact specific; as one court has observed "(I)ndeed, it is difficult to believe that any two prisoners could ever be considered 'similarly situated' for the purpose of judicial review on equal protection grounds of broadly discretionary decisions because such decisions may legitimately be informed by a broad variety of an individual's characteristics." *Rowe v. Cuyler*, 534 F. Supp. 297, 301 (E.D. Pa. 1982).

21. In this case the Petitioner was treated equally to other prisoners seeking parole in that he was given a hearing pursuant to state law where his individual circumstances were considered in determining whether he was suitable for parole or not. The fact that some prisoners were granted parole and Petitioner was not, for the reasons stated above, does not prove a violation of Petitioner's equal protection rights.

22. The undersigned has reviewed in some detail the voluminous exhibits submitted by both sides. The Petitioner has been incarcerated for 28 years for a crime he committed when he was 23 years old. Petitioner was not

4

arrested for the murder committed in 1973 until 15 years had passed, during which time Petitioner committed multiple serious assaults against other women. While serving his sentence for murder Petitioner has made some positive strides all of which are more fully set forth in the exhibits admitted during this hearing; however, it is impossible to overstate the grisly nature of the underlying offense, or for the undersigned to take the Parole Board to task for denying Petitioner parole. There was more than sufficient evidence to support the Board's decision, and the undersigned does not find any constitutional infirmities that would justify disturbing the Board's decision.

23.    Accordingly, for the reasons stated above the Petition for Post-Conviction Review is **denied**.

Date: July 7, 2016

BY _____
Robert E. Mullen, Justice
Maine Superior Court

---

During his parole hearing in 2006 Petitioner testified he beat the decedent to death with a hammer after he had run his vehicle into hers, the decedent had asked for insurance information in connection with the automobile collision, and Petitioner decided to stop the decedent from reporting him and the accident because he did not want to go to jail. The Law Court in affirming Petitioner's conviction for murder quoted trial testimony that Petitioner had told a former wife that "he had beaten a girl with a hammer and used her shirt to wipe the steering wheel. He told her he had beaten her unconscious and, when she started coming to, beat her again until her eye popped out..." *State v. Boucher*, 652 A.2d 76, 80 (Me, 1994).